# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00225-CR

**Daniel Wayne Bennett, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 119TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. DIS-18-01982, THE HONORABLE MIKE FREEMAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Daniel Wayne Bennett was convicted of continuous sexual abuse of a child and two counts of sexual assault of a child and was sentenced to forty-five years' imprisonment for the sexual-abuse count and ten years' imprisonment for each sexual-assault count. *See* Tex. Penal Code §§ 12.33, 21.02(b), (h), 22.011(a)(2). In six issues on appeal, Bennett argues that precautionary measures used during the pandemic caused structural error and that the trial court erred by granting the State's request for a change of venue, denying his motion to suppress, excluding defensive evidence, denying his motion for a directed verdict, and admitting extraneous-offense evidence. We will modify the trial court's judgments of conviction to correct clerical errors and affirm the judgments as modified.

## BACKGROUND

V.W. was born in October 1997 and lived in Paint Rock, Texas, with her mother, stepfather, brothers, and stepsisters. Stepfather worked for a construction company owned by

Bennett, who was a family friend. In addition to owning a construction company, Bennett maintained and cleaned several homes in or near the town. Bennett and others referred to two of the homes as the highway house and the river house because of their locations. When V.W. was twelve years old and in middle school, Bennett hired her to help clean the houses.

Bennett had a cell phone that he used for personal and business purposes, but he also purchased several other cell phones that he gave to family members, friends, and employees for them to use. The cell phones all had service through the same service provider. When V.W. first met Bennett, he was married and living with his wife and three stepdaughters, but he eventually divorced his wife after becoming involved with one of V.W.'s adult stepsisters.

In 2016, after turning eighteen years old, V.W. went to the police station to report that Bennett sexually abused her from age twelve to age seventeen at various locations, including the river house and the highway house. During a recorded interview with investigating officers, Bennett denied having any sexual contact with V.W. but admitted that she would clean houses for him. Bennett agreed to provide a DNA sample and stated that his DNA would be present in those houses because he had sex with V.W.'s stepsister in the houses. When V.W. reported the abuse, she described the inside of a bedroom in the river house, including the bedding, where she said abuse would occur. The investigating officers searched the river house and the highway house and seized the bedding in the river house and submitted it for forensic testing.

As part of their investigation, the police obtained Bennett's cell phone records pursuant to a warrant from 2009 to 2016 and records for another phone owned by Bennett that V.W. told the police she used and a phone that V.W. acquired later. The police reviewed the text messages exchanged between Bennett and V.W. obtained from these cell phone records.

2

During the investigation, the officers attempted to ascertain whether there were any other victims, and one of the individuals they interviewed told the officers to talk with P.M., who was then twenty years old and is Bennett's former wife's niece. The police then interviewed P.M., who described incidents where Bennett sexually abused her at his house when she was eight years old.

Bennett was arrested and charged with continuous sexual abuse of a child and with two counts of sexual assault of a child for incidents involving V.W. Before trial, the State moved to change venue, and Bennett filed a motion to suppress evidence, including evidence concerning the text exchanges described above. The trial court granted the motion to change venue, ordering that the case be transferred from Concho County to Tom Green County. The trial court denied Bennett's motion to suppress.

During the trial, the investigating officers described the efforts they undertook while investigating the allegations, and the recorded interview of Bennett was admitted into evidence during one officer's testimony. Further, one of the investigating officers related that Bennett confirmed the phone number for the phone that he used.

In addition, V.W. testified that Bennett sexually abused her from ages twelve to seventeen and that the incidents occurred in Bennett's house, in his workshop, in his truck, at the highway house, and at the river house. V.W. also identified the phone number belonging to Bennett and those for the phones that she said she used. During her testimony, the text exchanges between Bennett and V.W. were admitted into evidence. V.W. explained that she recognized most of the text exchanges and that the text messages were authored by Bennett and her. V.W. went through many of those exchanges during her testimony and explained how they showed that they would engage in sexual activity during those years.

Following V.W.'s testimony, a forensic scientist testified that he performed DNA testing on cuttings from the comforter collected from the river house that contained evidence of Bennett's DNA and V.W.'s DNA. More specifically, regarding one test, he explained that the DNA profile was a mixture from three individuals; that "[o]btaining this profile is 1.19 billion times more likely that the DNA came from suspect Bennett and two unknown individuals than if the DNA came from three unrelated, unknown individuals"; that "[o]btaining this profile is 238 quintillion times more likely that the DNA came from [V.W.] and two unknown individuals than if the DNA came from three unrelated, unknown individuals"; that V.W. and Bennett could not be excluded as contributors; and that V.W. was the primary contributor. Regarding another test, the forensic scientist testified that the DNA profile was a mixture from three individuals; that "[o]btaining this profile is 14.8 billion times more likely that the DNA came from suspect Bennett and two unknown individuals than if the DNA came from three unrelated, unknown individuals"; that "[o]btaining this profile is 81.3 billion times more [likely] if the DNA came from [V.W.] and two unknown individuals than if the DNA came from three unrelated, unknown individuals"; and that Bennett and V.W. could not be excluded as possible contributors.

Next, P.M. was called as a witness and testified that she went to Bennett's house regularly when she was young because he was married to her aunt. P.M. explained that Bennett inserted his penis into her vagina on two different days when she was eight years old and was swimming in the pool at his house. During her cross-examination, P.M. admitted that she later moved into Bennett's house with Bennett's stepdaughter who was her cousin after P.M. had a falling out with her parents. P.M. also admitted that when she was first questioned by the police, she initially denied that anything sexual happened.

4

The custodian of records for the cell-service provider for the three phones investigated in this case testified that the subscriber for Bennett's phone was Bennett. The custodian also explained that the subscriber for the first phone that V.W. said she used was Bennett but that there is an invoice record with V.W.'s name on it. Further, the custodian said that V.W. was the subscriber for the second phone that V.W. used.

During the trial, Bennett called several witnesses who testified that he had a good reputation for being honest and law-abiding. Next, Bennett's business partner was called to the stand and testified that Bennett had several phones and lent them to family, friends, and employees and that the first phone that V.W. testified that she used could have been used by several people. The business partner also identified Bennett's phone number but stated that Bennett did not text very often. The business partner also explained that he believed that he could identify who the authors of the texts were in the exhibit admitted during V.W.'s testimony and prepared a chart identifying whom he believed authored the text messages. Bennett sought to have the chart admitted, but the trial court sustained the State's objection.

One of Bennett's stepdaughters testified that Bennett never sexually abused her, that she never saw Bennett sexually abuse V.W. or P.M., and that Bennett could not have sexually abused P.M. in the pool without someone noticing. Bennett's stepdaughter also mentioned that P.M. moved into Bennett's house later. When asked about an assault that V.W. said occurred at Bennett's house, Bennett's stepdaughter explained that the incident could not have happened because Bennett was not there that day. Moreover, she stated that before the allegations were made, V.W.'s family became angry with Bennett because he threatened to evict one of V.W.'s stepsisters, who was leasing a house from him. Bennett's stepdaughter also identified Bennett's phone number and explained that he has used that phone for a long time

5

and for personal and business purposes. Another of Bennett's stepdaughters later testified that it would not have been possible for Bennett to sexually abuse P.M. at the pool without her seeing.

One of Bennett's stepsons testified that he would borrow Bennett's phone when he was in Paint Rock because his cell phone did not work in that town. He explained that he used to date one of V.W.'s stepsisters and that after reviewing some of the text messages from the State's exhibit, he believed those text messages were consistent with the types of text exchanges that he had with V.W.'s stepsister.

One of Bennett's former employees testified that he worked for Bennett when he was fourteen years old and then later rented a house from Bennett when he turned eighteen. He also stated that he had a romantic relationship with V.W. when they were in school together, that he would borrow Bennett's phone while at work, and that he would send V.W. text messages from Bennett's phone. The former employee said that he worked late with Bennett, which is why some of the text messages were sent late in the evening. During his cross-examination, the employee admitted that Bennett helped him and his family financially and that his father still works for Bennett.

V.W.'s stepsister who became romantically involved with Bennett testified that she had sex with him at the highway house and the river house. Further, the stepsister explained that several people used and traded the phones that Bennett provided, but she also identified the phone number that Bennett used. During her cross-examination, the stepsister stated that V.W. did work for Bennett at the river house.

Bennett elected to testify and denied having any sexual contact with V.W. or P.M. Bennett did admit that he hired people, including V.W., to help him maintain the river house, but he explained that V.W. was only at the river house a few times while her family was there and

6

that he was never alone with her. Further, Bennett testified that he owned several phones that he allowed others to use. During his cross-examination, Bennett identified his phone number and said that he used the phone for personal and business calls, but he also stated that he lent to multiple individuals the phone V.W. claimed as her first phone. Bennett admitted to having sex with V.W.'s stepsister at the river house and the highway house. In his testimony, Bennett related that he did not send any of the texts in the State's exhibit and did not know who could have been sending those messages from his phone.

At the conclusion of the trial, Bennett was convicted of all the charged offenses. Bennett appeals his convictions.

## DISCUSSION

In his first five issues on appeal, Bennett contends that the trial court erred by granting the State's motion to change venue, denying his motion to suppress, excluding a chart that he sought to admit into evidence, denying his motion for a directed verdict, and admitting extraneous-offense evidence. In his final issue, Bennett asserts that structural error occurred during the trial. Because the fourth issue could result "in greater relief than his other issue[s]," we address that issue first. *See Medina v. State*, 565 S.W.3d 868, 873 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd).

### Directed Verdict

In his fourth issue on appeal, Bennett argues that the trial court erred by denying his motion for a directed verdict regarding all three offenses because the evidence was insufficient to support his convictions.

7

An appellate issue challenging the denial of a motion for a directed verdict is a challenge to the sufficiency of the evidence supporting the conviction and is reviewed under the sufficiency standard. *See Williams v. State*, 582 S.W.3d 692, 700 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). "Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id.* "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally

8

insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

*Continuous Sexual Abuse*

Under the Penal Code, a person commits the offense of continuous sexual abuse of a child if the following occurs:

> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and
>
> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:
>
> > (A) a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense . . . .

Tex. Penal Code § 21.02(b). The term "act of sexual abuse" includes aggravated sexual assault, which occurs when an actor causes "the sexual organ of a child" younger than fourteen years old "to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor." *See id.* §§ 21.02(c)(4), 22.021(a)(1)(B)(iii), (a)(2)(B). "[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed" but "must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse." *Id.* § 21.02(d).

The indictment in this case alleged that from August 2009 through October 2011, Bennett committed two or more acts of sexual abuse against V.W. during a period that was 30 days or more in duration while she was younger than fourteen years old. Regarding the acts of

9

sexual abuse, the indictment alleged that Bennett committed aggravated sexual assault by intentionally and knowingly causing V.W.'s sexual organ to contact his sexual organ or by intentionally and knowingly causing her sexual organ to contact his mouth.

On appeal, Bennett contends that the evidence was insufficient to establish that any contact between V.W.'s genitals and his mouth occurred before she turned fourteen years old. Although Bennett acknowledges that V.W. testified about an incident in which Bennett "put his mouth down on [her] vagina," he notes that she testified that she did not remember whether the incident occurred before she turned fourteen. Moreover, although Bennett recognizes that V.W. did testify regarding two incidents that occurred before she turned fourteen—one at his shop and one at his house before a cheerleading camp—he emphasizes that portions of her testimony regarding those incidents were contradicted by other witnesses. Specifically, Bennett highlights that V.W. testified that there was running water at the shop at the time of the incident but that other witnesses testified that the shop did not have running water until years later, and Bennett also contends that V.W.'s testimony regarding the town in which the other offense occurred was inconsistent with the testimony of one of the investigating officers. Further, Bennett asserts that V.W. stated that she could not remember whether thirty days had passed between those incidents. Finally, Bennett argues that neither of those two incidents involved contact between his mouth and V.W.'s vagina "as alleged in the indictment" and, therefore, cannot support his conviction for continuous sexual abuse of a child.

As discussed above, Bennett contends that V.W.'s testimony discussing particular incidents occurring when she was younger than fourteen years old could not provide sufficient evidence because portions of her testimony were contradicted by other witnesses; however, we note that "[a] jur[y] can choose to believe or disbelieve all, some, or none of the evidence

presented" and that we must "presume that the fact finder resolved" conflicts in the evidence "in favor of the verdict and defer to that determination." *Edward v. State*, 635 S.W.3d 649, 655, 656 (Tex. Crim. App. 2021).  Further, although Bennett correctly points out that the indictment listed one of the types of sexual abuse as oral-genital contact, the State's decision to list this type of sexual abuse as one of the manners and means by which he allegedly committed the offense of continuous sexual abuse does not require that there be evidence of this particular manner and means to warrant a conviction provided that there is evidence of two or more acts of sexual abuse of the other types of abuse alleged in the indictment within the relevant time frame.  *See* Tex. Penal Code § 21.02(b)-(d); *see also Casey v. State*, 349 S.W.3d 825, 829 (Tex. App.—El Paso 2011, pet. ref'd) (explaining that jury "need not unanimously agree on which specific acts of sexual abuse the defendant committed, because those acts are merely the manner and means by which the 'series' element was accomplished").  Accordingly, even if the evidence is insufficient to establish that oral-genital contact occurred during the relevant time, the evidence supporting Bennett's conviction is not insufficient if there is evidence that two or more acts of some type of sexual abuse alleged in the indictment—here, causing V.W.'s sexual organ to contact Bennett's sexual organ—occurred within the applicable time frame.

V.W. explained during her testimony that she was born in October 1997, and the jury could have determined that she turned fourteen in October 2011.  Further, V.W. described three specific incidents that occurred prior to her turning fourteen.  First, she testified that when she was eleven years old, she spent the night at Bennett's house because she had a cheerleading event in town.  When describing the incident, she explained that when she was on the couch sleeping, Bennett removed her clothes, pinned her arms down, and inserted his penis into her vagina.  Second, she related that the next incident occurred at the river house when she went

11

there to clean. Regarding that incident, she stated that Bennett pushed her on the bed and had vaginal intercourse with her. When describing the timing of this event, she testified that more than thirty days had passed between the incidents at Bennett's house and the river house. Third, V.W. discussed a later assault at Bennett's shop on September 11, 2011, in which she cleaned for a while before Bennett grabbed her, threw her on the bed, removed her underwear, and inserted his penis into her vagina.[1]

Moreover, V.W. testified regarding the cell-phone records showing the exchanges between Bennett's phone and the first phone that she said she used and between his phone and the phone that she later acquired, and she identified text messages authored by Bennett and her, including ones sent before she turned fourteen. Although other witnesses testified that other people used Bennett's phone and the first number associated with V.W., we must presume that the jury resolved the conflicts in the evidence in favor of conviction and a determination that Bennett and V.W. authored the text messages in question. An exhibit containing the text exchanges between Bennett's phone and the first phone that V.W. said she used was admitted into evidence and included the following exchanges occurring before V.W. turned fourteen:

> October 29, 2010: Bennett asks V.W. why she was ignoring him, which he described as "messed up" and says he "won[']t ask again." V.W. says she was tired of her stepsister being jealous of the time they spend together.
>
> December 31, 2010: Bennett and V.W. say that they love each other.
>
> August 10, 2011: Bennett tells V.W. to walk to the school so that he could pick her up and take her to one of the houses to work.
>
> September 11, 2011: Bennett tells V.W., "Thank u for cleaning the shop."

---

[1] In her testimony, V.W. discussed other incidents that occurred at the river house, at the highway house, and in Bennett's truck. However, she did not testify whether those events occurred before or after she turned fourteen years old.

12

September 24, 2011: Bennett asks V.W. if she is mad at him and if she wants "to work sometime."

From V.W.'s testimony and other evidence, the jury could reasonably infer that Bennett committed two or more acts of sexual abuse—here, causing her sexual organ to contact his sexual organ—during a period that is thirty or more days in duration while she was younger than fourteen years old. *See* Tex. Penal Code § 21.02; *see also* Tex. Code Crim. Proc. art. 38.07 (providing that testimony from witness who was child at time of offense is sufficient to support conviction in sexual-offense case). Accordingly, we must conclude that the evidence is legally sufficient to support Bennett's conviction for continuous sexual abuse.

*Sexual Assault of a Child*

In this issue, Bennett also asserts that the evidence is legally insufficient to support his two convictions for sexual assault of a child.

Under the Penal Code, an individual commits the offense of sexual assault of a child if "the person intentionally or knowingly: . . . (C) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor," "regardless of whether the person knows the age of the child at the time of the offense." Tex. Penal Code § 22.011(a)(2)(C). Moreover, the Penal Code defines a child as "a person younger than 17 years of age." *Id.* § 22.011(c)(1). The indictment in this case alleged that Bennett "did then and there intentionally and knowingly cause the sexual organ of [V.W.], a child who was then and there younger than 17 years of age, to contact" his sexual organ "on or about" May 29, 2013, and July 15, 2013.

On appeal, Bennett contends that although the State introduced a text exchange in which he asked V.W. to go to the river house with him on May 29, 2013, V.W. did not testify

13

whether she went to the house on that date. Next, Bennett notes that V.W. did testify that she met Bennett at the highway house on July 15, 2013, but asserts that she did not testify whether any sexual activity occurred on that date. Further, Bennett contends that V.W.'s testimony was insufficient because she could not remember when the last sexual incident occurred other than to say it was close to when she graduated and could not remember details regarding other incidents. Moreover, Bennett urges that V.W. admitted that some incidents occurred after she turned seventeen and that without evidence indicating that any incidents occurred before she turned seventeen, "the evidence is insufficient to permit conviction" for the two counts of sexual assault of a child.

As set out above, V.W. testified that that she was born in October 1997, meaning that she turned seventeen in October 2014. During her testimony, she did provide a date for an incident occurring after she turned fourteen and before she turned seventeen. Specifically, she testified that Bennett had sex with her in his shop on her fourteenth birthday. Similarly, although she did not specify her age, she explained that Bennett had sex with her on another occasion while she was in eighth grade. Moreover, she provided general testimony describing the sexual nature of their encounters when she explained that Bennett had sex with her in the highway house and in his truck, had sex with her more than twice at the river house, and had sex with her more than twenty times from when she was eleven until she turned seventeen.

During her testimony, V.W. also discussed text exchanges between Bennett and herself that she received on and sent from the first phone that she used after she turned fourteen and before she turned seventeen. Further, V.W. discussed how when Bennett would text her to ask her to "go with [him]" or to meet him somewhere, that meant that he wanted to have sex with her. In her testimony, V.W. discussed the following text exchanges:

14

November 2, 2011: Bennett asks V.W. to come to his house or the river house. She responds by saying "I don't want to do that anymore." He asks, "Will u if I take u to town." In response, she says that she does not know if she would, and he then asks if she is mad at him.

December 26, 2011: Bennett asks, "r u going to river with me some time." V.W. replies, "Why," and he responds, "Really."

May 18, 2012: Bennett asks, "U w[ant] to make some money." V.W. replies, "Well I need some for cheerleading," and "Is there anyway u can get me the rest of my cheerleading money today?" Bennett responds, "R u going to go with me."

April 19, 2013: Bennett asks V.W. what she was doing and "Can y go with me sometime." She responds, "Nope." When Bennett asks why, she answers, "Cuz I dont want to."

May 29, 2013: V.W. asks if there is anyway she could "work cuz i need 26 dollars by friday so I can pay for my letterman jacket." Bennett responds, "Can u go to river with me." She agrees to meet up with him and asks him to pick her up. Bennett instructs her to "Walk down road by school." She agrees and then asks Bennett where he is after she arrives at the school.

June 9, 2013: V.W. asks Bennett if she is getting her iPod. Bennett replies, "When can you go," and "Can u go now."

June 29, 2013: Bennett asks, "Can u go with me soon."

July 11, 2013: V.W. says, "I dont wanna do that anymore." Bennett asks, "What did I do wrong." She replies, "I will clean but nothing else."

July 15, 2013: Bennett asks V.W. to meet him at the highway house; tells her, "I need u get over there"; explains that he has time before a meeting; and tells her to tell her brother that she is cleaning. She agrees to go to the house and later responds, "Im here."

July 22, 2013: V.W. asks Bennett to tell her mother that he is taking her out of town to work because she wanted to go somewhere else and not tell her mother where she was going. Bennett responds by asking "Can y go with me tonight." She replies, "Ill go wit u wednesday if u say I have to work outta town so I can use moms truck . . . ."

August 1, 2013: Bennett asks, "U w[a]nt to go with me sometime." V.W. replies, "Do you have any work for me today?" and explains that she "wanna actually work i need some money to get school clothes." Bennett answers, "Dont be mean. Get over here."

August 14, 2013: In response to a text from Bennett asking her to "just go with me," V.W. replies, "I dont wanna do anything." Bennett responds, "Come on. Pretty plz."

August 26, 2013: V.W. asks Bennett to check on a car that she was interested in. Bennett replies, "U never w[a]nt to go with me." She answers, "Well I will if we go look at the car." Bennett responds, "Go with me now, and then I will start looking."

December 12, 2013: Bennett asks, "Cant u com over here for a little bit." V.W. answers, "Not right now," and explains that she cannot leave. Bennett responds, "Then send me a good picture off u" and later tells her to "just send it" after she says no. Bennett states, "But u never do[] nothing I ask." She responds, "Cuz I don't wanna fuck all the time just to be able to get something." Later Bennett asks, "Just come over here plz." She replies, "Do u want me to tell mom everything." Bennett asks, "Y r u being this way."

January 26, 2014: Bennett asks, "Will u go with me." V.W. answers, "Not right now." Bennett replies, "Plz."

March 12, 2014: V.W. asks Bennett for some money because she is going shopping. Bennett responds, "U going to go with me."

March 13, 2014: V.W. again requests money to go shopping. Bennett asks, "Can U go with me this morning real fast." She states that she cannot then but "I'll go tomorrow or Saturday."

September 19, 2014: Bennett asks, "Can u go with me." V.W. replies that she cannot because she is working.

September 20, 2014: V.W. asks, "If I go with you after work can you do me a favor?" and then asks Bennett to tell her mother that she has to clean houses so that she can go see her boyfriend. Bennett agrees to tell her mother that story. V.W. explains that she would head to the river house to meet him after work and later states, "I just got off on my way." Bennett responds, "Ok."

V.W. also discussed other text exchanges between Bennett and herself that were in the State's exhibit and that she received on and sent from the second phone that she used after turning seventeen. In several of those text messages, Bennett asks V.W. to "go with him." In other exchanges, V.W. tells Bennett that she is going to tell her mother what has been happening.

16

From the subject matter of the text messages, V.W.'s description of the meaning behind the words, the continuation of similar dialogue occurring between Bennett's phone and her second phone for which she was the subscriber, and her description of sexual events occurring between Bennett and herself, the jury could reasonably infer that Bennett had sexual intercourse with her and, therefore, caused her sexual organ to contact his sexual organ on May 29, 2013, and July 15, 2013, as alleged in the indictment, where the text messages show that V.W. agreed to meet him and indicated that she did meet up with him.

Even if that evidence was insufficient to establish the assaults on the dates alleged in the indictment, other evidence would have allowed the jury to reasonably conclude that Bennett had sexual intercourse with V.W. and committed the acts alleged in the indictment in March 2014 and September 2014. Although those are not the dates mentioned in the indictment, "[i]t is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *See Sanchez v. State*, 400 S.W.3d 595, 600 (Tex. Crim. App. 2013) (quoting *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997)). The March 2014 and September 2014 events occurred before the indictment was presented in January 2018, and there is no statute of limitations for the offense of sexual assault of a child. *See* Tex. Code Crim. Proc. art. 12.01(1)(B). In addition to V.W.'s testimony regarding the sexual nature of their encounters, the text exchanges from those months used the coded language that V.W. described in her testimony and indicated that V.W. met up with Bennett.

For these reasons, we conclude that the evidence is legally sufficient to support Bennett's convictions for sexual assault of a child and, therefore, that the trial court did not

17

err by denying Bennett's motion for a directed verdict. Accordingly, we overrule his fourth issue on appeal.

**Change of Venue Motion**

In his first issue on appeal, Bennett contends that the trial court erred when it granted the State's motion to change venue from Concho County to Tom Green County. When making this argument, Bennett concedes that "it is likely that within the community of Paint Rock there would be" biased individuals, but he argues that the evidence presented during the hearing established that most of the county's population lived in other towns and that potential jurors from those other communities could have been selected. Further, Bennett asserts that the relatively small size of the county would not have prohibited the gathering of a sufficient jury pool. Next, Bennett contends that any potential prejudice stemming from the initial outcry would have been significantly reduced by the time the trial was originally set to begin four years later, and he notes that the initial trial setting was set back even further due to delays stemming from health issues, the unavailability of a witness, and the pandemic.

Article 31.02 of the Code of Criminal Procedure governs venue changes requested by the State. *See* Tex. Code Crim. Proc. art. 31.02. In particular, the statute provides as follows:

> Whenever the district or county attorney shall represent in writing to the court before which any felony or misdemeanor case punishable by confinement, is pending, that, by reason of existing combinations or influences in favor of the accused, . . . a fair and impartial trial as between the accused and the State cannot be safely and speedily had . . . the judge shall hear proof in relation thereto, and if satisfied that such representation is well-founded and that the ends of public justice will be subserved thereby, he shall order a change of venue to any county in the judicial district in which such county is located or in an adjoining district.

*Id.*

18

Appellate courts review rulings on motions to change venue for an abuse of discretion. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). "This is a deferential standard of review that requires appellate courts to view the evidence in the light most favorable to the trial court's ruling." *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). "The trial judge is in a better position than we are to resolve such issues as a result of his ability to observe the demeanor of witnesses and scrutinize their veracity face to face." *Hathorn v. State*, 848 S.W.2d 101, 109 (Tex. Crim. App. 1992). Accordingly, "an appellate court must not substitute its own judgment for that of the trial court, and it must uphold the trial court's ruling if it is within the zone of reasonable disagreement." *Burch*, 541 S.W.3d at 820. A "trial court's ruling is within the 'zone of reasonable disagreement' when there are two reasonable views of the evidence." *Id.* (quoting *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018)). "Generally, a court's decision regarding change of venue will not be considered an abuse of discretion when there is conflicting evidence on that issue." *Cook v. State*, 667 S.W.2d 520, 522 (Tex. Crim. App. 1984).

When the State filed its motion to change venue, it included two affidavits in support of its motion. The first was from the Chief Sheriff's Deputy for the county who averred that the investigation has divided the community and become a topic of interest among the residents. Further, the Chief Deputy explained that Bennett is an elected official serving on the Paint Rock School Board and a business owner with "substantial contacts and extended family in the community." Next, he mentioned that there have been competing petitions in the community regarding whether Bennett should continue in his role as a school-board member before trial, that one of the petitions had been placed in a local grocery store, that there are 1,925 potential jury

19

members in the county, and that more than 130 residents have signed one of those petitions. In light of the preceding, the Chief Deputy asserted that "a fair and impartial trial between the accused and the State cannot be safely and speedily had."

The Chief Deputy later testified at a hearing on the motion to change venue. Regarding the petitions, he testified that the one in favor of Bennett had over 100 signatures and that the other one had 37 signatures. In addition, he explained that the local newspaper ran a story about the allegations, that he has overheard on multiple occasions conversations about the case in restaurants throughout the county, and that the case has been discussed in a neighboring county where Bennett has done construction work. The Chief Deputy also testified that Bennett is one of the few contractors in the county, that his company performs work throughout the county, and that he has helped almost everyone "in Paint Rock at some point" and extends "every courtesy . . . to the whole community." During his cross-examination, the Chief Deputy related that although only 130 of the 1,925 potential jurors signed one of the petitions, he believes more individuals have a leaning one way or another because "everybody's talked about" the case. He also stated that although he has overheard multiple conversations about the case, he has heard only one conversation expressing partiality.

In the second affidavit, a Texas Ranger noted that the community has been divided by the case and mentioned that Bennett is a voting member of the Concho County Appraisal Board, giving him "limited countywide authority." Regarding the competing petitions, the Ranger stated that the school superintendent explained that the petition seeking to keep Bennett on the school board has three times more signatures than the opposing petition, that witnesses told him that they are "being harassed and threatened by persons close to . . . Bennett,"

20

and that members of the community have been attending school board meetings wearing shirts with "the name Bennett Construction on them."

During the hearing on the motion, the Ranger testified that Bennett's construction company has significant ties to the community because the company performs work at the school and for surrounding counties. The Ranger also stated that Bennett has extended family in the community. Further, the Ranger related that there were influences in the community that would prevent a fair and impartial trial from occurring. In his cross-examination, he acknowledged that there are other communities in Concho County besides Paint Rock, that he has only seen one of the petitions, and that he has not attended school board meetings or personally seen people wearing shirts with Bennett's name on them.

Bennett submitted two affidavits controverting the State's motion to change venue. A Concho County resident of more than 25 years made the first affidavit and explained "that the residents and citizens of Concho County are so diverse within their own individual communities that the vast majority . . . from which a jury panel would be chosen have not ever heard of . . . Bennett or his case" and that both the State and Bennett would receive a fair trial in Concho County. In a second affidavit, the chairperson of the Republican Party in Concho County averred that other communities in Concho County had larger populations than Paint Rock had and that rumors regarding Paint Rock citizens "are consistently of no concern" to the population living in the other communities, "which make up more than 90% of the potential jury panelists in the case." Further, she explained that she believed the State and Bennett would receive a fair trial in Concho County.

At the hearing, Bennett called as a witness a local businessman, who testified that although people talked about the allegations when they were first made, he has not heard anyone

21

in the community recently talking about the case or expressing any partiality concerning the allegations. He also expressed his belief that a fair trial could be held in Concho County. During his cross-examination, he admitted that he has worked with Bennett before, that his daughter used to date Bennett's stepson, and that he signed one of the petitions concerning Bennett at a school board meeting.

After reviewing the evidence, the trial court granted the motion to change venue and transferred the case to Tom Green County.

Although Bennett presented evidence and elicited testimony indicating that a fair trial could occur in Concho County, the State presented evidence that there were existing combinations or influences in favor of Bennett indicating that a fair and impartial trial could not be held there. *See* Tex. Code Crim. Proc. art. 31.02; *see also Cook*, 667 S.W.2d at 522 (noting that there generally is no abuse of discretion in ruling on issue where there is conflicting evidence on issue). For example, the State presented evidence showing that Bennett held two positions of power in the community, that he had extensive contacts in Paint Rock and other communities, that he was one of the only contractors in the county and had performed work throughout the county, that he had helped out a large segment of the population from which the jury would be pulled, that a large subset of the population and potential jury pool had expressed a favorable opinion of Bennett by signing a petition supportive of his position on the school board, that many more people signed the petition in favor of Bennett than the other petition, that the petition in favor of Bennett was displayed in a local grocery store and at a school board meeting, that individuals supporting Bennett had been harassing and threatening potential witnesses, that a law-enforcement officer overheard multiple conversations in the community regarding the case,

22

and that a law-enforcement officer believed that a fair and impartial trial could not be held in Concho County.

Based on this record, we cannot conclude that the trial court abused its discretion by granting the State's motion to change venue. *See Crawford v. State*, 685 S.W.2d 343, 348-49 (Tex. App.—Amarillo 1984) (noting that trial court was entitled to believe State's evidence regarding motion to change venue even though it was disputed and concluding that trial court did not abuse its discretion by granting State's motion to change venue where State alleged defendant was attorney and "a prominent citizen" of county, had "served as county attorney," and had relative who worked for district attorney's office and where witnesses testified that climate in the community would not allow State to have fair trial and that there were influences or combinations of individuals in community who if seated on jury could not be fair), *aff'd on other grounds by Crawford v. State*, 696 S.W.2d 903, 908 (Tex. Crim. App. 1985).

For these reasons, we overrule Bennett's first issue on appeal.

**Motion to Suppress**

In his second issue on appeal, Bennett asserts that the trial court erred by denying his pretrial motion to suppress. In his motion, Bennett sought to suppress, among other items, the cell-phone record showing text exchanges between his phone and the phones associated with V.W. Bennett argued that the text messages were seized without probable cause and in violation of state and federal law, that the data the State turned over to him was incomplete and had been manipulated by agents of the State, and that the information disclosed failed to include contextual information vital to his defense. For those reasons, Bennett asserted that all of the text exchanges should be suppressed. During a hearing on the motion, Bennett acknowledged that the State had disclosed the record but argued that there was information missing from

23

what the State handed over to the defense. Specifically, Bennett asserted that the State had a duty to disclose information regarding other text messages that were sent from those phones to other people around the same times as the messages on which the State is relying. Bennett contended that the phones were used by several people and that this additional information would help establish the identity of the individuals sending the text messages at issue. After the hearing, the trial court denied the motion to suppress without issuing any findings of fact or conclusions of law.

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Appellate courts will sustain the trial court's ruling on the motion if it is correct under any applicable theory of law. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). In general, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *See State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see also Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "When the trial court does not make explicit findings of fact, as in the case before us, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record." *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018).

On appeal, Bennett presents several interrelated arguments regarding the trial court's suppression ruling. First, Bennett acknowledges that the State provided him the series of text messages containing conversations between his phone and the two phones associated

with V.W., but he contends that "there were other text messages, sent at or near the time of the ones reflected" in the State's exhibit "that would have shown that other persons besides" Bennett and V.W. "were using the phones at the time." Further, Bennett argues that he did not have the ability to obtain those records because under federal law only prosecutors and other governmental entities may obtain from cell-service providers records showing the content of text messages. *See* 18 U.S.C. § 2703(b)(1); *see also id.* § 2702 (authorizing provider to divulge contents of communication to various individuals including subscribers).

Relatedly, Bennett urges that because it had the authority to request those records, the State "was in constructive possession of the records." In light of this constructive possession, Bennett contends that the State failed to comply with its obligations under the Michael Morton Act and *Brady v. Maryland* by failing to look at and disclose those records in its constructive possession. Along those lines, Bennett notes that the Michael Morton Act "codifies and 'supplements' prosecutors' constitutional" due-process "obligations under *Brady*," by requiring the production of items that were not previously discoverable, *see Hillman v. Nueces Cnty.*, 579 S.W.3d 354, 360 (Tex. 2019), and asserts that those obligations required the State to disclose the records that he requested.

Given the expansion of discovery created by the Michael Morton Act, Bennett asserts that this Court should conclude that if the State is not in possession of evidence but has some means to obtain it, "the State has an expanded obligation to disclose that information" and should have done so in this case. Further, Bennett asserts that the State's inaction impacted his Sixth Amendment right to present a complete defense and his right to due process under the Fourteenth Amendment. For these reasons, Bennett contends that this Court should reverse his conviction and render a judgment of acquittal due to the State's violations of the Michael Morton

25

Act or conclude that the suppression motion should have been granted, reverse his convictions, and remand for a new trial.

The legislature's enactment of the Michael Morton Act was "an overhaul of discovery in Texas." *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021). For example, the Act imposes on the State a "free-standing duty to disclose all 'exculpatory, impeaching, and mitigating' evidence to the defense that tends to negate guilt or reduce punishment." *Id.* (quoting Tex. Code Crim. Proc. art. 39.14(h)). The Act also imposes a duty to disclose that "is much broader than the prosecutor's duty to disclose as a matter of due process under *Brady v. Maryland*," by not limiting certain disclosures "to 'material' evidence." *Id.* (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). However, the Act specifies that the State is obligated to disclose these types of information when they "are in the possession, custody, or control of the state or any person under contract with the state." *See* Tex. Code Crim. Proc. art. 39.14(a), (h).

During the hearing, the State explained, and Bennett did not disagree, that it had disclosed to him all of the information that it received from the cell-service provider by giving him a copy of the PDF that it received from the provider and giving him an excel spreadsheet with the information. Further, the State explained that it had not sought and had not been given the additional information that Bennett was seeking. Although Bennett contends that the information that he requested was necessary to present his defense, "'[t]here is no general constitutional right to discovery in a criminal case,' the United States Supreme Court has concluded, and 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'" *In re State ex rel. Best*, 616 S.W.3d 594, 600 (Tex. Crim. App. 2021) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). "In discovery matters,

26

the State's attorney is answerable only for evidence in his direct possession or in the possession of law enforcement agencies." *Valdez v. State*, 116 S.W.3d 94, 100 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). For that reason, an "appellant cannot predicate error on the trial court's refusal to order the State to turn over information it did not possess." *Id.*; *see also Turpin v. State*, 606 S.W.2d 907, 915 (Tex. Crim. App. 1980) (noting that where there is no showing that State possessed items sought, "the defendant is not entitled to relief on appeal"). Further, although the duty to disclose may extend to items in the State's "constructive possession," *see State v. Heath*, 642 S.W.3d 591, 597 (Tex. App.—Waco 2022, pet. granted), we have not been pointed to any case law standing for the proposition that the State can constructively possess information belonging to a company with which the State has no relationship.

Accordingly, on this record, we must conclude that the trial court did not abuse its discretion by determining that the Michael Morton Act did not require the State to obtain from the cell-service provider and disclose to Bennett records of text exchanges that Bennett wanted disclosed but which were not in the possession, custody, or control of the State or someone under contract with the State. *See* Tex. Code Crim. Proc. art. 39.14; *see also In re Harris*, 491 S.W.3d 332, 336 (Tex. Crim. App. 2016) (orig. proceeding) (noting that appellate courts have "held that trial judges have overstepped their authority to order pretrial discovery in situations where they have required a party to create a document that did not exist at the time of the discovery order"); *In re Stormer*, No. WR–66865–01, 2007 WL 1783853, at *2 (Tex. Crim. App. June 20, 2007) (not designated for publication) (holding that former Article 39.14 does not give trial court authority to order State to create and produce document that did not already exist).

Moreover, because the duty to disclose under the Michael Morton Act is broader than the due-process obligation set out in *Brady*, *see Watkins*, 619 S.W.3d at 275, we must also conclude that the trial court did not abuse its discretion by failing to conclude that the State was obligated under the due process directives of *Brady* to obtain and disclose the text messages that Bennett wanted, *see Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011) (providing that *Brady* does not obligate State to disclose exculpatory evidence that is not in its possession and that it does not know exists).

For these reasons, we conclude that the trial court did not abuse its discretion by denying Bennett's motion to suppress and, therefore, overrule his second issue on appeal.

**Exclusion of Defensive Exhibit**

In his third issue on appeal, Bennett contends that the trial court erred by excluding a chart as an exhibit. Bennett sought to have the chart admitted during the testimony of his business partner. In his testimony, Bennett's partner identified Bennett's phone number, explained that Bennett had other phones in his possession that he loaned out to other people, and stated that the phone V.W. identified as her first phone was used by multiple individuals. Additionally, Bennett's partner testified that because of his relationship with Bennett and Bennett's family, friends, and employees, he was familiar with their texting patterns and could recognize their text messages based on the language used and the idiosyncrasies of the individuals' personalities. Moreover, Bennett's partner stated that he made a chart showing whom he believed made the text messages that the State relied on when making its case and that were in the State's exhibit previously admitted. In his testimony, Bennett's partner admitted that the contents of the chart were based on information he learned when interviewing or talking with individuals whom he believes authored the text messages.

28

Bennett moved to have the exhibit admitted for demonstrative purposes. The State objected to the admission of the chart on grounds that Bennett's partner was not an expert in recognizing language patterns of different people and that the chart was based on speculation, was not based on his personal knowledge, was substantially more prejudicial than probative, and was not relevant. The trial court sustained the objection and then later specified that it also sustained the objection because the chart contained hearsay.

On appeal, Bennett contends that the trial court abused its discretion by not admitting the chart because his partner could provide lay opinion testimony regarding the authors of the various text messages and, therefore, because the chart constituted a summary of his partner's lay testimony and would have aided the jury in making their determination. *See* Tex. R. Evid. 701. Further, Bennett contends that lay opinion testimony is admissible for identification purposes such as handwriting and voice identification, *see Denham v. State*, 574 S.W.2d 129, 131 (Tex. Crim. App. 1978); *Molina v. State*, No. 08-16-00318-CR, 2018 WL 4346820, at *3 (Tex. App.—El Paso Sept. 12, 2018, no pet.) (op., not designated for publication), and argues that evidence concerning text-message patterns should not be treated any differently from evidence "identifying the peculiarities of a person's handwriting or voice." Additionally, Bennett notes that courts have permitted identification of the author of text messages through nonexpert witnesses. *See Butler v. State*, 459 S.W.3d 595, 605 (Tex. Crim. App. 2015); *Cain v. State*, 621 S.W.3d 75, 80-82 (Tex. App.—Fort Worth 2021, pet. ref'd). For these reasons, Bennett contends that the trial court erred by excluding the chart.

Appellate courts review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, an appellate court reviews the trial court's ruling in light of

the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

"'Hearsay' means a statement that . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Tex. R. Evid. 801(d). "Hearsay is not admissible unless" provided otherwise by a statute, the Rules of Evidence, or "other rules prescribed under statutory authority." *Id.* R. 802. "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." *Id.* R. 701. "Perceptions refer to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (i.e., things the witness saw, heard, smelled, touched, felt, or tasted)." *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002). "Since Rule 701 requires the testimony to be based on the witness's perception, it is necessary that the witness personally observed or experienced the events about which he or she is testifying." *Id.* "Thus, the witness's testimony can include opinions, beliefs, or inferences as long as they are drawn from his or her own experiences or observations." *Id.* "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tex. R. Evid. 602. In the absence of a basis upon which the lay opinion was formed, the opinion is "a factually unsupported inference or presumption." *Curlee v. State*, 620 S.W.3d 767, 785 (Tex. Crim. App. 2021). "[J]uries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (quoting *Hooper*, 214 S.W.3d at 15).

Although Bennett highlights cases in which nonexpert witnesses authenticated text exchanges, the circumstances of those cases differ significantly from those present here. In *Butler* and in *Cain*, the defendants objected that text messages allegedly exchanged between the victims and the defendants had not been properly authenticated, and the reviewing courts determined that the victims who participated in text exchanges with the defendants could authenticate the text exchanges under Rule of Evidence 901 where the contents of the text messages and other factors indicated that the texts were authored by the defendants. *See Butler,* 459 S.W.3d at 599-600, 601-03, 606; *Cain*, 621 S.W.3d at 78-80, 82-87; *see also* Tex. R. Evid. 901 (requiring proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is" and listing non-exhaustive types of evidence that may be used to meet that burden).

In this case, the trial court made its ruling on several grounds other than authentication, including hearsay and speculation grounds. Bennett's partner testified that the chart he prepared identified whom he believed authored the text messages in the State's exhibit. However, he did not testify that he was a participant in any of the text threads or that he observed anyone write or receive any of the text messages for which he sought to provide an opinion regarding whom he believed authored the messages. Instead, he explained that he was able to identify the authors of the messages through the language that was used and through his familiarity of the texting patterns of Bennett and his relatives, friends, and employees. However, Bennett's partner did not further elaborate on any idiosyncratic phrasing or other patterns that helped him to determine whom he thought authored the messages. Further, he did not testify regarding how the content of any of the text messages established that anyone other than Bennett and V.W. wrote them. Moreover, rather than relying only on his own personal perceptions,

31

Bennett's partner admitted that his opinion was also based on information that he gathered when questioning people whom he suspected might have had access to and used the cell phones, in other words hearsay. *Cf. Molina*, 2018 WL 4346820, at *3 (determining that officer could testify as lay witness regarding defendant's voice where officer's opinion was "based on his perception from having experienced many encounters with" defendant).

In light of the preceding, we must conclude that the trial court did not abuse its discretion by excluding the evidence. The chart could have been excluded based on inadmissible hearsay and speculation. *See* Tex. R. Evid. 802; *Braughton*, 569 S.W.3d at 608. The cases relied on by Bennett are inapplicable to those rulings. *See Butler*, 459 S.W.3d at 599 (addressing authentication of text messages); *Denham*, 574 S.W.2d at 131 (discussing whether lay witness could testify that knife was deadly weapon after observing and receiving wound and listing other types of permissible lay witness testimony); *Cain*, 621 S.W.3d at 80-82 (discussing authentication of text messages); *Molina*, 2018 WL 4346820, at *3 (addressing lay witness testimony regarding voice recognition where witness testified that he recognized defendant's voice from previous encounters). Accordingly, we conclude that the trial court did not abuse its discretion by excluding from evidence the chart and overrule Bennett's third issue on appeal.

**Extraneous Offense Evidence**

In his fifth issue on appeal, Bennett contends that the trial court erred by allowing P.M. to testify regarding two extraneous sexual assaults that he allegedly committed against her when she was eight or nine years old. When presenting this issue, Bennett recognizes that article 38.37 of the Code of Criminal Procedure authorizes the admission of extraneous sexual offenses involving children during trials for sexual offenses involving children, but he asserts that the trial court failed to perform its gatekeeping function under article 38.37 before allowing P.M. to

testify. Specifically, Bennett notes that P.M. testified regarding the allegations during an in-camera hearing before testifying at trial, that during the hearing she said that the two incidents happened on the same day, that the State questioned her about whether she told the police that the incidents occurred on separate days, and that P.M. stated that her description of the incidents at the hearing was the same as what she told the officers. Further, Bennett highlights that P.M. testified at trial that the two incidents happened on two separate days and argues that the trial court should have excluded her testimony based on the inconsistency of her testimony at the hearing from what she told the police. Bennett also contends that the testimony was inherently inflammatory and prejudicial to his case and should have been excluded under Rule of Evidence 403. As in the prior issue, we review the trial court's ruling for an abuse of discretion. *See Tillman*, 354 S.W.3d at 435.

*Admissibility Under Article 38.37*

Section 2 of article 38.37 lists certain sexual offenses involving children, including continuous sexual abuse of a child, aggravated sexual assault of a child, and sexual assault of a child, and explains that in trials for those types of crimes, "evidence that the defendant has committed a separate offense" included in that list "may be admitted in the trial . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant" "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence." Tex. Code Crim. Proc. art. 38.37, § 2. That directive is subject to the requirement that the trial court first conduct a hearing outside the presence of the jury to determine whether "the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." *Id.* art. 38.37, § 2-a.

33

A person commits the offense of aggravated sexual assault of a child if he "causes the penetration of the anus or sexual organ of a child by any means" and if "the victim is younger than 14 years of age, regardless of whether the person knows the age of the victim at the time of the offense." Tex. Penal Code § 22.021(a)(1)(B)(i), (a)(2)(B). During the in-camera hearing, P.M. testified that Bennett grabbed her, pulled her bathing suit to the side, and inserted his penis into her vagina. A conviction for sexual assault of a child "is supportable on the uncorroborated testimony of the victim of the sexual offense." Tex. Code Crim. Proc. art. 38.07; *see Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).

As set out above, Bennett contends that the trial court did not properly perform its gatekeeping function because it should have excluded P.M.'s testimony after she testified at the hearing that the two assaults occurred on the same day even though she told the police that they happened on different days. Even if there was an inconsistency regarding when the two events occurred, P.M.'s testimony at the hearing indicates that the number of events and the nature of the assaults to which she testified were consistent with the statement she made to the police. Further, the record reveals that P.M. was emotional during the hearing, and the trial court could have reasonably concluded that the alleged difference between her testimony and her statement to the police could be attributed to her mental state and the fact that she was having to discuss the personal violations in a public setting. *See Deggs v. State*, 646 S.W.3d 916, 924 (Tex. App.—Waco 2022, pet. ref'd) (explaining that in 38.37 hearing trial court is sole arbiter of credibility of witnesses and weight to give their testimony and can resolve conflicts in evidence and "draw reasonable inferences" from evidence); *see also Melder v. State*, No. 12-12-00400-CR, 2014 WL 1922570, at *6 (Tex. App.—Tyler May 14, 2014, pet. ref'd) (mem. op., not designated for publication) (noting that victim of sexual abuse varied "minor details of the abuse" when

34

recounting abuse but that victim was "clear" regarding defendant's role in abuse). Moreover, although we look to the record that was before the trial court when it made its ruling, *Khoshayand*, 179 S.W.3d at 784, we do note that P.M. testified at trial that the incidents occurred on different days, which is consistent with the statement that she allegedly provided to the police.

Accordingly, we conclude that the trial court did not abuse its discretion by admitting P.M.'s testimony under article 38.37. *See* Tex. Code Crim. Proc. art. 38.37, §§ 2, 2-a.

*Admissibility Under Rule 403*

In this issue, Bennett also argues that the trial court should have excluded P.M.'s testimony under Rule of Evidence 403. That rule provides that a "[trial] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "When evidence of a defendant's extraneous acts is relevant under Article 38.37, the trial court still is required to conduct a Rule 403 balancing test *upon proper objection or request*." *Distefano v. State*, 532 S.W.3d 25, 31 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (emphasis added). In other words, "even when the trial court admits extraneous offenses pursuant to article 38.37, an appellant must object at trial that the probative value of the extraneous offense is substantially outweighed by the risk of undue prejudice to preserve a Rule 403 complaint on appeal." *Keller v. State*, 604 S.W.3d 214, 228 (Tex. App.—Dallas 2020, pet. ref'd). Generally, for a complaint to be preserved for appellate review, "the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion" and that "the trial court . . . ruled on the request, objection, or motion, either expressly or implicitly" or "refused to rule on the request,

objection, or motion, and the complaining party objected to the refusal." *See* Tex. R. App. P. 33.1(a).

At the hearing, Bennett did not assert that P.M.'s testimony should be excluded under Rule 403 or otherwise assert that the probative value of her testimony was substantially outweighed by the danger of unfair prejudice. Instead, Bennett argued that article 38.37 was unconstitutional and, therefore, failed to preserve any complaint regarding Rule 403. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016) (noting that preservation of error is systemic requirement on appeal); *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (observing that reviewing courts should not address merits of issue that has not been preserved for appeal); *see also Alvarado v. State*, No. 04-14-00027-CR, 2014 WL 6475370, at *2 (Tex. App.—San Antonio Nov. 19, 2014, no pet.) (mem. op., not designated for publication) (determining that defendant waived objection under Rule 403 to evidence admitted under article 38.37 where defendant did not make objection under Rule 403).

For these reasons, we overrule Bennett's fifth issue on appeal.

## Structural Error

In his final issue on appeal, Bennett contends that precautionary measures taken during the trial to prevent the spread of COVID-19 by requiring witnesses to wear face shields violated his rights to due process and due course of law and resulted in error warranting a new trial. *See* U.S. Const. amend. XIV; Tex. Const. art. I, § 19. As support for this proposition, Bennett points to a statement from the trial court during V.W.'s testimony in which the court explained to the jury that it had been informed "that the shield is causing some problems. I talked to the attorneys. We all agree there's nothing we can do about that. I'm sorry. There's just a period of time getting over Covid. We'll just have to bear with it." Although Bennett

acknowledges that he did not make an objection, ask for a mistrial, or request a continuance to a time when the procedures would no longer be used, he urges that this type of error is structural error not requiring error preservation because the procedures hindered the jurors' ability to understand the witnesses and evaluate their credibility.

"A 'structural' error 'affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself,'" is not amenable to a harm analysis, *Jordan v. State*, 256 S.W.3d 286, 290 (Tex. Crim. App. 2008) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)), and "may be raised for the first time on appeal barring an express waiver of the right," *Munguia v. State*, 636 S.W.3d 750, 753 n.1 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). Structural errors constitute a "highly exceptional category" of errors. *U.S. v. Davila*, 569 U.S. 597, 611 (2013). Only federal constitutional errors can be considered structural ones, but most federal constitutional errors are not structural. *See Schmutz v. State*, 440 S.W.3d 29, 35 (Tex. Crim. App. 2014). Appellate courts treat errors as structural only if the United States Supreme Court has labeled them as structural. *Lake v. State*, 532 S.W.3d 408, 411 (Tex. Crim. App. 2017).

The United States Supreme Court has not labeled the type of error alleged here as structural error, and we must therefore conclude that it is not structural. *See Lake*, 532 S.W.3d at 417; *see also Davila*, 569 U.S. at 611 (providing list of structural errors). Accordingly, we overrule Bennett's sixth issue on appeal. *See* Tex. R. App. P. 33.1; *see also Clark v. State*, 365 S.W.3d 333, 339,340 (Tex. Crim. App. 2012) (explaining that constitutional errors "can be forfeited" by failure to object and concluding that defendant forfeited due-process claim "by not properly preserving error at trial"); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App.

1995) (concluding that defendant failed to preserve complaint that he was denied constitutional rights to due process and due course of law).

**Clerical Error in the Judgments**

Although not raised as an issue on appeal, we note that there are clerical errors in the trial court's judgments of conviction. Although the record reflects that the case was transferred from Concho County to Tom Green County, *see* Tex. Code Crim. Proc. art. 31.02, the judgments of conviction all list Concho County as the county of conviction. This Court has the authority to modify incorrect judgments when it has the information necessary to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). Accordingly, we modify the judgments of conviction to reflect that Bennett was convicted in Tom Green County.

## CONCLUSION

Having modified the trial court's judgments of conviction to reflect that Bennett was convicted in Tom Green County and having overruled all of Bennett's issues on appeal, we affirm the trial court's judgments of conviction as modified.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly

Modified and, as Modified, Affirmed

Filed: November 17, 2022

Do Not Publish